## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Crim. No. 06-186 (GK)** |
| | **:** | |
| **STEPHANIE EMERSON OLDS** | **:** | |
| | **:** | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing. For the reasons set forth herein, defendant should be sentenced to a 51-month period of incarceration and ordered to pay the full restitution amount agreed upon by the parties to the victims in this case, the United States and the District of Columbia. This recommended period of incarceration is based not only on the facts which defendant admitted at the plea hearing, but also on additional relevant conduct that is set forth herein and in the two affidavits accompanying this memorandum.

I. **Defendant's Schemes**

    A. Embezzlement from DC Child and Family Services Agency

From in or about March 2002 until in or about December 2003, defendant OLDS was employed at the District of Columbia Child and Family Services Agency ("CFSA"), the D.C. agency dedicated to protecting children at risk for abuse and neglect. OLDS worked as a budget analyst, as well as in CFSA's Accounting Division, where her duties included processing purchase orders and invoices for the agency and entering information into an accounting database. In her position, she sometimes had direct contact with CFSA's contractors. In addition to the aforementioned duties, OLDS also sorted the mail, which sometimes included checks intended for

and belonging to CFSA. OLDS's office was in Washington, D.C.

In or about the summer and fall of 2003, OLDS devised and implemented a scheme to steal money that rightfully belonged to CFSA. Using her position at CFSA, OLDS obtained checks from businesses that owed money to CFSA. OLDS then deposited these checks into her personal bank account. This money belonged to CFSA, and OLDS converted the money to her own use, having no authority from CFSA to do so. In this scheme, OLDS succeeded in stealing $24,749.33 from CFSA. (11/13/2007 Plea Hearing Tr. 12-16.) Appendix D to the Affidavit of Internal Revenue Service ("IRS") Revenue Agent Jennifer L. Abbott ("Abbott Affidavit" or "Abbott Aff.") (Exhibit 1 attached hereto) is a table showing the five checks belonging to CFSA which OLDS deposited (or, in the case of the fifth check, attempted to deposit) into her personal bank account. The five checks totaled $29,999.33.

     1. <u>Kinko's Check</u>

The first check that OLDS embezzled was for $3,520.58, drawn on the account of Kinko's, and dated July 11, 2003. The check was payable to "S.L. Emerson, Attn: Michelle Edmonds - VP."

On or about July 8, 2003, OLDS caused a letter to be sent to Kinko's from a fake company called "S.L. Emerson." (Emerson is OLDS's maiden name.) The letter stated, "My office was contacted and was requested to provide you authorization to release payment in the amount of $3,520.58 along with CFSA." The letter requested that Kinko's send this $3520.58 to OLDS's Washington, D.C. post office box and was signed by "Michelle Edmonds," who was identified as "Vice President" of the sham "S.L. Emerson" company.

Also on or about July 8, 2003, OLDS caused a letter to be sent to Kinko's from "Karen

Edwards" of CFSA.  No one named Karen Edwards was employed by CFSA.  The letter, which was on CFSA letterhead, stated, "This letter is to authorize and release Kinko's from liability regarding issuance of the refund in the amount of $3,520.58 to S.L. EMERSON."

On or about July 11, 2003, based on these false representations, Kinko's issued a check for $3,520.58.  On or about July 16, 2003, OLDS deposited this check into her personal bank account.  OLDS had no authority to convert this check to her own use.

### 2. Virginia Commonwealth University Check

The second check that OLDS embezzled was for $9,563.58, drawn on the account of Virginia Commonwealth University, and dated August 11, 2003.  The check was payable to "Child and Family Svcs Agency, S L Emerson, 400 Sixth Street SW Rm 2085, Washington DC 20024."

On or about July 23, 2003, Virginia Commonwealth University caused two vouchers to be created, calling for CFSA to receive a refund totaling $9,563.58.  The refund was for CFSA's overpayment for "Competency Based Knowledge and Skill Traits under the direction of Linda C. Sawyers."

On or about August 11, 2003, based on these vouchers, Virginia Commonwealth University sent a check to CFSA for $9,563.58.

On or about August 19, 2003, OLDS deposited this check into her personal bank account.  OLDS had no authority to convert this check to her own use.

### 3. AT&T Check

The next check that OLDS embezzled was for $2,830.17, drawn on the account of AT&T, and dated October 29, 2003.  The check was payable to "Child and Family Serv - Dis of C, Attn: Stephanie Olds."

3

On or about November 3, 2003, OLDS presented the check to her bank for deposit. Along with the check, OLDS provided the bank a fraudulent letter, on CFSA letterhead, and purportedly from the fictitious "Karen Edwards." The letter stated: "This check belongs to Stephanie Olds. It is not made out to CFSA. This is her payroll check for consultant work done on a contract. We are holding no claim to this payment. Our name is only to reference the contract worked on."

Based on these false representations, on or about November 3, 2003, OLDS's bank negotiated the check and, after a short hold, deposited $2,830.17 into OLDS's account. OLDS had no authority to convert the check to her own use.

    4. <u>Keystone Education Check</u>

The next check that OLDS embezzled was for $8,835.00, drawn on the account of Keystone Education, and dated October 28, 2003. The check was payable to "DC Child & Family Serv. Agency."

On or about November 29, 2003, OLDS presented the check to her bank for deposit. Along with the check, OLDS provided the bank a fraudulent letter, on CFSA letterhead, and purportedly from the fictitious "Karen Edwards." The letter stated: "In regards to check #00164126 for $8,835.00 made payable to CFSA. This check after audit findings is contractual pay for Stephanie Emerson-Olds. Please allow her to deposit this payment as CFSA relinquishes all rights entitled to this check."

Based on these false representations, on or about November 29, 2003, OLDS's bank negotiated the check, and, after a short hold, deposited $8,835.00 into OLDS's account. OLDS had no authority to convert the check to her own use.

5.  <u>Devereux Foundation Check</u>

OLDS also attempted to embezzle a check for $5,250.00, drawn on the account of The

Devereux Foundation, and dated December 5, 2003.   The check was payable to "DC Child &

Family Services, Accounting Division."

On or about December 19, 2003, OLDS presented the check to her bank for deposit.

Along with the check, OLDS provided the bank a fraudulent letter, on CFSA letterhead, and

purportedly from the fictitious "Karen Edwards." The letter stated: "This is contractual pay for

Stephanie Olds.  After audit findings it was concluded that this check belongs to her.  Please

allow her to deposit it and funds available immediately."

OLDS's bank accepted the check, but placed a five-day hold on it.  During that five-day

period, the bank decided not to honor the check.  OLDS had no authority to attempt to convert

this check to her own use.

B.  <u>False Claims and Fraud on Federal and DC Tax Returns</u>

In 1998 through 2003, defendant OLDS was a resident of the District of Columbia.

OLDS was employed in and earned income through a number of jobs, including working for the

District of Columbia, Georgetown University Hospital, and area supermarkets.  Appendix A to

the Abbott Affidavit is an approximate time line of OLDS's employers from January 1998 to

December 2003.  Appendix A-1 consists of three pages from OLDS's personnel file reflecting

her full-time employment as Collections Manager for the medical office of Dr. Michael D. Paul

from June 1, 1999, to May 31, 2000.  Appendix A-2 consists of a Georgetown University

Hospital personnel record reflecting OLDS's full-time employment as Accounts Analyst in the

Anesthesia Department from January 24, 2001, to March 12, 2002.  Appendix A-3 consists of

two pages of documents from OLDS's personnel records reflecting her full-time employment as Budget Analyst for the District of Columbia government from March 18, 2002, to December 23, 2003.

As a resident of the District of Columbia, OLDS was required to file both federal and District of Columbia individual income tax returns. For the tax years of 1998, 1999, 2000, 2001, 2002, and 2003, OLDS filed federal individual income tax returns ("Form 1040"). For the tax years of 1998, 1999, 2000, 2001, and 2002, OLDS filed District of Columbia individual income tax returns ("Form D-40"). In 1998, it appears that OLDS prepared her own Form 1040 and Form D-40 returns. For the other tax years, OLDS employed a tax preparer ("Tax Preparer"), who was located in the District of Columbia, to prepare each of these Form 1040 and Form D-40 tax returns. Each year, OLDS provided the Tax Preparer with a Form W-2 and otherwise informed the Tax Preparer (e.g., by faxed letter) of the amount of money that OLDS's employer had withheld from OLDS's salary for the payment of federal and District of Columbia individual income taxes.

For the tax years of 1999, 2000, 2001, 2002, and 2003, based on the W-2 and other data that OLDS provided, the Tax Preparer completed and transmitted Form 1040 to the IRS. Also, for the tax years of 1999, 2000, 2001 and 2002, based on the W-2 and other data that OLDS provided, the Tax Preparer completed and transmitted Form D-40 to the District of Columbia Office of Tax and Revenue ("OTR"). OLDS directed the Tax Preparer to use a Washington, D.C. post office box, number 92791, on each Form 1040 and Form D-40 as OLDS's address. For the tax year of 1998, using the same Washington, D.C. post office box as her address, OLDS filed her Form 1040 with the IRS and her Form D-40 with OTR.

6

OLDS filed false Form 1040 and Form D-40 returns for the tax year of 1998. On the returns, OLDS claimed that an employer, for whom she did not work in 1998, had withheld from her salary large amounts of money for federal and District of Columbia income tax payments.[1] OLDS claimed large tax refunds to which she was not entitled. OLDS well knew that the inclusion on her Form 1040 and Form D-40 of the false tax withholding information would cause the United States and the District of Columbia, respectively, to mail to OLDS large tax refunds to which OLDS was not entitled.

For the remaining tax years, OLDS provided the Tax Preparer with false information that OLDS knew would cause the Tax Preparer to file false federal and District of Columbia individual income tax returns on OLDS's behalf.

Specifically, for each tax year in which the Tax Preparer prepared OLDS's returns, OLDS provided the Tax Preparer with a Form W-2 and otherwise informed the Tax Preparer that an employer, for whom OLDS did not work in the relevant tax year, had withheld from her salary large amounts of money for federal and District of Columbia income tax payments.[2]

---

[1] OLDS listed Dr. Edward H. Saunders, located at 715 Florida Ave., N.W., Washington, D.C. 20001, as her employer on her 1998 W-2 form.

[2] For tax years 1999-2002, OLDS indicated on her W-2 forms and in her correspondence with her Tax Preparer that her employer was Dr. Saunders' practice, Metropolitan Urology Group, located at the same address as is listed on her 1998 W-2 form. For tax year 2003, OLDS listed MGMC, LLC (MedStar Georgetown Medical Center) as her employer in her fax to her Tax Preparer. Her Tax Preparer failed to notice that her listed employer had changed and continued to use Metropolitan Urology Group as OLDS's employer when preparing her 2003 tax returns. The Tax Preparer's mistake, however, is of no consequence, because in 2003, OLDS worked for neither Metropolitan Urology Group nor MGMC, LLC; OLDS worked full-time at the District of Columbia Child and Family Services Agency and part-time at Safeway. Moreover, as in the previous years, the Tax Preparer included on the 2003 Form 1040 the false tax withholding figures which the Tax Preparer received from OLDS and which OLDS knew would cause the United States to issue to OLDS a large tax refund to which OLDS was not

OLDS claimed large tax refunds to which she was not entitled.  OLDS well knew that the

inclusion on each Form 1040 and Form D-40 of the false tax withholding information would

cause the United States and the District of Columbia, respectively, to mail to OLDS large tax

refunds to which OLDS was not entitled.  Appendix B to the Abbott Affidavit is a bar graph

which compares the false federal income tax withholdings reported by OLDS with the actual

federal income tax withheld by OLDS's employers in tax years 1998-2003.  Appendix C to the

Abbott Affidavit is a bar graph which compares the federal income tax refunds falsely claimed

by OLDS with the correct federal income tax refunds or payments due in tax years 1998-2003.

OLDS did not inform her Tax Preparer that, in 2003, OLDS had received $24,749.33

from the embezzlement scheme described in Part I.A., supra.

As a result of her actions, OLDS claimed and received the following false tax refunds

from the United States:

| Tax Year | Date that OLDS filed her tax return | Amount of refund claimed by OLDS | Date that the refund check was mailed to OLDS | Amount of refund received by OLDS |
|----------|-------------------------------------|----------------------------------|-----------------------------------------------|-----------------------------------|
| 1998 | 3/29/99 | $12,718.00 | 5/28/99 | $13,839.00 |
| 1999 | 4/12/00 | $10,924.00 | 4/28/00 | $10,924.00 |
| 2000 | 1/23/01 | $15,683.00 | 2/23/01 | $15,683.00 |
| 2001 | 1/30/02 | $21,260.00 | 3/1/02 | $21,260.00 |
| 2002 | 1/28/03 | $28,139.00 | 2/28/03 | $28,139.00 |

entitled.

| 2003 | 3/3/04 | $26,468.00 | No check mailed[3] | $0 |

The false federal tax refunds that OLDS claimed for tax years 1998-2003 totaled $115,192.00.

The false federal tax refunds that OLDS received for tax years 1998-2003 totaled $89,845.00.

(Abbott Aff. ¶ 11.)

As a result of her actions, OLDS claimed and received the following false tax refunds from the District of Columbia:

| Tax Year | Date that OLDS filed her tax return | Amount of refund claimed by OLDS | Date that the refund check was mailed to OLDS | Amount of refund received by OLDS (including refund money used to pay outstanding tax liability) |
|---|---|---|---|---|
| 1998 | 4/15/99 | $ 5,431.20 | No check mailed. Used to pay outstanding tax liability. | $3,532 .00[4] |
| 1999 | 4/15/00 | $ 7,061.00 | 4/18/00 | $ 7,061.00 |
| 2000 | 2/05/01 | $10,189.00 | 2/9/01 | $10,189.00[5] |

---

[3]The United States did not mail a refund check to OLDS for her 2003 tax return because the IRS had frozen OLDS's account.

[4]The District of Columbia audited OLDS's returns for the tax years 1996-1998. The 1998 return was adjusted, after audit, from a refund of $5,431.00 to a refund of $3,532.00. The adjusted refund was used to offset audit liability of $3,104.60 for 1996 and to offset audit liability for 1997. OLDS, therefore, did not receive a check for this $3,532.00.

[5]For the 2000 tax year, part of OLDS's requested refund of $10,189.00 was used to pay the outstanding balance due from the audit of the 1997 return. OLDS, therefore, received a check for the reduced amount of $6,091.92

| 2001 | 2/06/02 | $13,902.00 | 2/7/02 | $13,902.00 |
| 2002 | 1/31/03 | $23,036.00 | 2/11/03 | Check intercepted in the mail |

The false DC tax refunds that OLDS claimed for tax years 1998-2002 totaled $59,619.20.  The

false DC tax refunds and credits that OLDS received for tax years 1998-2002 totaled $34,684.00.

(Abbott Aff. ¶ 12.)

    C.  Theft from Dr. Michael D. Paul

    One of the jobs in which OLDS was actually employed and through which OLDS earned

income was as Medical Office Collections Manager for Dr. Michael D. Paul.  OLDS worked for

Dr. Paul from June 1, 1999, until May 31, 2000.  OLDS resigned when Dr. Paul discovered that

OLDS was stealing money from his practice.  She admitted in her resignation letter that she stole

the money by cashing numerous office checks, making numerous long-distance calls from the

office telephone lines, and using the punch-in clock to inflate the office hours she worked.  On

June 2, 2000, OLDS paid Dr. Paul $12,000 in cash, as restitution for the money she had

embezzled from his practice, with the understanding that Dr. Paul would not press criminal

charges against her.  Appendix E to the Abbott Affidavit is the May 31, 2000 resignation letter

from Stephanie Olds to Dr. Michael D. Paul, signed and dated on June 2, 2000, with a

handwritten notation concerning the $12,000 restitution payment.

    D.  Theft from Seville Condominium Association

    In May 2004, OLDS was hired by the Seville Condominium Association Board of

Directors ("the Board") as the on-site property manager for the Seville Condominium ("the

Seville") located at 3450 Toledo Terrace, in Hyattsville, Maryland.  At the time that OLDS was

hired, the property management company for the Seville was Commercial Management Group ("CMG"), and CMG maintained corporate bank accounts for the Seville at Bank of America. OLDS was the signator of the accounts and received the account statements at her office at the Seville.

In May 2005, the Board fired CMG and hired Abaris Realty, Inc. ("Abaris") as its property management company. OLDS remained in her position as the Seville's on-site property manager. As part of the transition from CMG to Abaris, OLDS was instructed to close all of the Seville's corporate accounts that CMG had maintained at Bank of America. OLDS closed several such accounts, but, unbeknownst to the Board or Abaris, OLDS left one of the Seville's accounts at Bank of America open.

Unbeknownst to the Board or Abaris, OLDS continued to deposit into the open account at Bank of America checks made payable to the Seville Condominiums, such as checks for laundry commissions, condominium fees, and party room rental fees. These checks should have been turned over to Abaris and deposited into a new bank account established by Abaris on behalf of the Seville. OLDS used the money that she secretly deposited into the Bank of America account – that belonged to the Seville – for personal expenditures, such as furniture, gas, groceries, clothing, and hotel stays. She paid for these personal purchases using the debit CheckCard for the Seville's account or by making withdrawals from the Seville's account at ATM machines. None of these personal withdrawals and expenditures were known to or approved by the Board or Abaris. (Exhibit 2, Affidavit of IRS Special Agent Erica Ford ("Ford Affidavit" or "Ford Aff."), ¶ 6.)

For example, Appendix A to the Ford Affidavit is a copy of the November 2005 bank

11

statement for the Seville's operating account at Bank of America, which lists, among other withdrawals, two purchases with Card # 4635 7800 0082 1712 on November 23, 2005 from Regency Furniture, one for $1,794.98 and another for $199.49. Appendix B to the Ford Affidavit consists of copies of two invoices from Regency Furniture and corresponding Visa receipts for purchases with the same card number in the same amounts on November 22, 2005. In the signature line of the CheckCard receipts, above the printed words "THE/SEVILLE, A," appears OLDS's signature. OLDS's signature also appears on the two invoices. These purchases were neither known to nor authorized by the Board or Abaris.

Similarly, Appendix A to the Ford Affidavit, the November 2005 bank statement for the Seville's operating account at Bank of America, lists, among other withdrawals, a payment with Card # 4635 7800 0082 1712 on November 29, 2005, to Center City Consortium for $1,860.00. Appendix C to the Ford Affidavit consists of a credit card authorization form noting the same card number and signed by OLDS, a Visa receipt for a payment to Center City Consortium with the same card number for the same amount on November 28, 2005, and a Center City Consortium account statement for OLDS reflecting a credit card payment for the same amount on November 28, 2005, for school fees, tuition, and late fees. This payment was neither known to nor authorized by the Board or Abaris.

In addition, Appendix D to the Ford Affidavit is a copy of the August 2006 bank statement for the Seville's operating account at Bank of America, which lists, among other withdrawals, two payments with Card # 4635 7800 0091 1364, posted on August 29, 2006, to the Radisson Plaza Lord Baltimore, each for $312.76. Appendix E to the Ford Affidavit consists of copies of two invoices from the Radisson Plaza Lord Baltimore, each for a hotel room from

August 25 to 27, 2006, reflecting payment of $312.76 for each on August 27, 2006, with a Visa card with the same last four digits as in Appendix D (the first several digits are protected and noted as "X"). At the top of each invoice is the name "Stephanie Olds"; one invoice also includes the address "446 Buchanan Street, Washington, DC 20011" beneath OLDS's name. These hotel stays were neither known to nor authorized by the Board or Abaris.

Using this scheme, OLDS stole approximately $41,000 from the Seville between August 2005 and November 2006.[6] To date, Abaris's insurance company has been unable to recover any of these funds from OLDS. (Ford Aff. ¶ 9.)

E.   Fraud During Employment at Meadow Greens Court Apartments

From December 20, 2006, to July 9, 2007, OLDS was employed by E & G Property Services ("E&G") as an apartment manager at Meadow Greens Court Apartments ("Meadow Greens"), located at 3539 A Street, SE, in Washington, DC, and was earning an annual salary of $55,993. (Presentence Investigation Report ("PSR") ¶ 88; Ford Aff. ¶ 10.) While working there, OLDS misappropriated E&G's funds for her personal use, having no authority from E&G to do so. On June 1, 2007, a tenant at Meadow Greens submitted two money orders, one for $80 and one for $500, as payment of rent. (Ford Aff. ¶ 10.) Instead of depositing them in E&G's account, OLDS made the $80 money order payable to herself ("Stephanie Olds") and the $500 money order payable to "Olds & Olds Lawn Service" (see Appendix F to Ford Aff.); both money orders were subsequently cashed. (Ford Aff. ¶ 10.) E&G has never hired Olds & Olds Lawn Service to do work on its property. (Id.)

Also in June 2007, OLDS hired two employees, Ashley and Andre Scott, the niece and

---

[6]OLDS was terminated by Abaris on November 9, 2006.

nephew of defendant's friend Thomas Young, without authorization and paid them with

cashier's checks from SunTrust bank.  (Ford Aff. ¶ 11; Appendix G to Ford Aff.)  In addition, on

July 3, 2007, OLDS caused a check to be drawn upon a fictitious bank account, which she

purported was held by E&G at First Union National Bank, and sent to Signius Communications,

the provider of E&G's answering service.  (Ford Aff. ¶ 12; Appendix H to Ford Aff.)  OLDS

undertook all of these fraudulent actions without the knowledge or authorization of E&G.

II.  **Defendant's Plea**

      A.  Procedural Background

      On June 23, 2006, a federal grand jury sitting in the District of Columbia handed up an

indictment charging defendant with three counts of making false claims and one count of first-

degree fraud.  On December 14, 2006,  a federal grand jury sitting in the District of Columbia

returned a superseding indictment charging defendant with three counts of making false claims,

one count of theft from a program receiving federal funds, and two counts of first-degree fraud.

The Court reserved a trial date of April 23, 2007, which was later changed to August 6, 2007,

with an alternative trial date of September 24, 2007.  Although a plea agreement hearing

commenced on the morning of May 29, 2007, defendant changed her mind later that afternoon

and moved to continue the hearing.  On June 5, 2007, a federal grand jury sitting in the District

of Columbia returned a second superseding indictment charging defendant with three counts of

making false claims, one count of theft from a program receiving federal funds, and two counts

of first-degree fraud.  The Court reserved a new trial date of November 13, 2007, and, as set

forth infra, the government expended a significant amount of time and resources preparing for

this trial.  On the last business day before the trial was scheduled to begin, defendant advised the

Court that she wished to have new counsel appointed for her.  On the day that the trial was scheduled to begin, after the Court held a hearing and rejected defendant's request for new counsel – and with government witnesses from California and elsewhere literally waiting at airports to board their planes – defendant advised the Court that she wished to enter a guilty plea.

      B.  <u>November 13, 2007 Plea Hearing</u>

On November 13, 2007, defendant entered a plea of guilty to Counts Two, Three, and Six of the second superseding indictment, i.e., to one count each of theft from a program receiving federal funds, making false claims, and first-degree fraud.  As set forth in the transcript of the plea hearing, defendant admitted to embezzling $24,749.33 from CFSA (as described in Part I.A., <u>supra</u>),  making false claims on her federal tax returns in 2001, and committing fraud on her DC tax returns in 2001 and 2002 (using the scheme described in Part I.B, <u>supra</u>).  (11/13/2007 Plea Hearing Tr. 12-21.)

As set forth in the written plea agreement, defendant and the government agreed that the defendant's base offense level under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).  (Plea Agreement, p.2, ¶ b.)  Defendant and the government also agreed to an addition of 12 levels for "Loss greater than $200,000," pursuant to U.S.S.G. § 2B1.1(b)(1)(F).  (<u>Id.</u>)

III.  **Defendant's Total Offense Level is 18**

The PSR has correctly calculated defendant's adjusted offense level at 18 (PSR ¶ 46). This includes the base offense level of 6 pursuant to U.S.S.G. § 2B1.1(a)(2), and an addition of 12 levels for "loss" of over $200,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(F).  The PSR has also correctly calculated defendant's total offense level at 18 (PSR ¶ 49).  Defendant and the

government did not agree to any reduction for acceptance of responsibility, and the PSR writer
properly concluded that the two points for acceptance of responsibility are not warranted here
(PSR ¶ 39a).  Defendant should receive no downward adjustment under U.S.S.G. § 3E1.1(a) in
light of her failure to voluntarily terminate her criminal activities, the last-minute nature of her
guilty plea, and her blame-shifting and poor excuses for her misconduct.  For the reasons set
forth, <u>infra</u>, in Part IV of this Memorandum, the government is seeking imposition of a 51-month
sentence, which is within the prescribed Guideline range.

    A.  <u>Loss Valuation is Properly Calculated at Over $200,000</u>.

As part of her plea before the Court, defendant has agreed that the total loss in this case is
greater  than $200,000.00.  (See Plea Agreement, p.2, ¶ b.)[7]

Valuation is governed by U.S.S.G. § 2B1.1(b)(1) and includes all relevant conduct.  <u>See</u>
U.S.S.G. § 1B1.3(a)(2) (same course of conduct or common scheme or plan as the offense of
conviction).  For purposes of sentencing, the "loss" is the greater of either the actual loss or the
intended loss.  U.S.S.G. § 2B1.1, comment (n. 3); <u>see also</u> <u>United States v. Manas</u>, 272 F.3d 159,
165 (2d Cir. 2001) ("Consistent with the provisions applicable to conspiracy cases, the
Commentary [of section 2F1.1] states that 'if an intended loss that the defendant was attempting
to inflict can be determined, this figure will be used if it is greater than the actual loss."), <u>cert.
denied</u>, 537 U.S. 1023 (2002);  <u>United States v. Studevent</u>, 116 F.3d 1559, 1561 (D.C. Cir. 1997)
(finding actual loss should not limit the amount of intended loss attributed to defendant's crime
under § 2F.1.1).  "Actual loss" means the reasonably foreseeable pecuniary harm that resulted

_____

[7]In her objections to the PSR, defendant takes issue with how much over $200,000 the
total loss is, but agrees that the total loss is over $200,000.  (See PSR p.29.)

from the offense while "intended loss" includes pecuniary harm that was intended to result from

the crime as well as intended pecuniary harm that would have been impossible or unlikely to

occur (e.g., an insurance fraud in which the claim exceeded the insured value).  U.S.S.G. §

2B1.1, comment (n. 3(A)).

The sentencing judge is "in a unique position to assess the evidence and estimate the loss

based upon that evidence," and the Court need only make a "reasonable estimate of the loss."

U.S.S.G. § 2B1.1, comment (n.3).  The Court need not determine the value of the loss with any

degree of precision; a reasonable estimate of the loss based on the available evidence will

suffice.  See United States v. Carter, 412 F.3d 864, 839 (8th Cir. 2005); United States v.

Resurreccion, 978 F.2d 759, 762 (1st Cir. 1992) (intended loss should be used in sentencing,

even if imprecise, when larger figure than actual loss).

As already noted, OLDS agreed in the written plea agreement – as well as in her

objections to the PSR (see PSR p.29) – to a loss amount greater than $200,000 (Plea Agreement,

p.2, ¶ b).  As further support for the parties' agreement that total loss exceeds $200,000, we

attach the affidavits of Jennifer L. Abbott and Erica Ford.  As set forth in the Abbott Affidavit

and in Parts I.A. and I.B., supra, the intended loss from just the CFSA embezzlement and federal

and DC tax schemes totals over $200,000.[8]  If defendant's embezzlement of funds from three

other employers – Dr. Paul, the Seville, and E&G – is added in, the total intended loss exceeds

$250,000.  (See Abbott Aff. ¶ 13 (defendant stole $12,000 from Dr. Paul); Ford Aff. ¶¶ 9-10

_____

[8]The five checks which defendant embezzled or attempted to embezzle from CFSA totaled $29,999.33.  The false federal tax refunds that defendant claimed for tax years 1998-2003 totaled $115,192.00, and the false DC tax refunds that defendant claimed for tax years 1998-2002 totaled $59,619.20.

(defendant stole $41,000 from the Seville and at least $580 from E&G).)

      B.  <u>Defendant is not entitled to any adjustment for acceptance of responsibility.</u>

OLDS is not entitled to a two-level decrease for acceptance of responsibility in light of her failure to terminate voluntarily her criminal activities, the last-minute nature of her guilty plea, and her blame-shifting and poor excuses for her misconduct.

Since the time of her wrongdoing in this case, OLDS has continued to steal from her employers, even while on pretrial release in this case and as recently as June 2007. For example, in August 2006 – only two months after her indictment in this case – OLDS used the Seville's Visa check card to pay for two hotel rooms at the Radisson Plaza Lord Baltimore without the knowledge or authorization of her employer (see Ford Aff. ¶ 9 and Appendices D and E thereto). And in June 2007, while working for E&G as an apartment manager at Meadow Greens, OLDS converted two money orders totaling $580 – which were intended for E&G as rent payment by a Meadow Greens tenant – for her personal use, having no authority from E&G to do so (see Ford Aff. ¶ 10 and Appendix F thereto). Such ongoing criminal conduct while on pretrial release justifies denial of a two-point reduction for acceptance of responsibility. <u>See</u>, <u>e.g.</u>, <u>U.S. v. Carrington</u>, 96 F.3d 1, 9-10 (1st Cir. 1996) (three-point reduction for acceptance of responsibility denied because defendant, after arrest for fraud and while on pretrial release, attempted to obtain and deposit fraudulent bank drafts), <u>cert. denied</u>, 520 U.S. 1150 (1997); <u>United States v. Rhodes</u>, 894 F. Supp. 1, 5 (D.D.C. 1995) (defendant's commission of bank fraud, pending sentencing on his conviction for bank fraud, rendered him ineligible for the two-level reduction for acceptance of responsibility despite his guilty plea), <u>aff'd</u>, 88 F.3d 1279 (D.C. Cir. 1996). The Guidelines specify that a court, in its acceptance of responsibility determination, may consider whether the

defendant has voluntarily terminated all criminal conduct.  See U.S.S.G. § 3E1.1, comment

(n.1.b.); United States v. Mason, 966 F.2d 1488, 1497 (D.C. Cir.) (noting that the U.S.

Sentencing Commission, by providing for a reduced sentence for a defendant who accepts

responsibility for his crime, has determined that a defendant's "voluntary termination" of all

criminal activity is a relevant factor), cert. denied, 506 U.S. 1040 (1992).  Where the defendant

commits additional crimes while on pretrial release, a district court may view that as evidence

that the defendant has not voluntarily terminated all criminal conduct and lacks sincere remorse,

and, accordingly, may decline to award a two-point reduction for acceptance of responsibility on

that ground alone.  See United States v. O'Neil, 936 F.2d 599, 600-01 (1st Cir.1991) (district

court could reasonably conclude that defendant's marijuana use in violation of bail conditions

showed that he lacked "authentic remorse" for his crimes and could deny two-level reduction for

acceptance of responsibility on that basis).  This is true even where the defendant, like OLDS,

has pled guilty.  Id. at 600-01; see also United States v. Morrison, 983 F.2d 730, 733-35 (6th

Cir.1993); United States v. Reed, 951 F.2d 97, 99-100 (6th Cir.1991) ("Those who continue their

crimes in jail and do not voluntarily withdraw from their criminal conduct demonstrate . . . a

cynical and remorseless contempt for law.  Such continued criminal conduct is incompatible

with the idea of acceptance of responsibility."), cert. denied, 503 U.S. 996 (1992); United States

v. Shah, 263 F.Supp.2d 10, 37 (D.D.C. 2003) (denying any adjustment for acceptance of

responsibility because defendant continued engaging in the narcotics trade while in jail), aff'd &

judgment remanded, 453 F.3d 520 (D.C. Cir. 2006).

        In this case, defendant not only continued to commit crimes while on pretrial release, but

she used methods of fraud and theft similar to those that she employed while working at CFSA

to steal from her more recent employers.  At CFSA, she intercepted checks intended for and belonging to the agency and used deception to get some of those checks made payable to her (e.g., the Kinko's check was made payable to a fictitious company which she named S.L. Emerson, her maiden name) (see supra Part I.A.1).  Similarly, while working at Meadow Greens in June 2007, she intercepted two money orders intended for E&G and made them payable to herself and to Olds & Olds Lawn Service (see supra Part I.E.).  And while working at the Seville, she used fraud and deception to intercept checks intended for and belonging to the Seville, deposit those checks in an account that she was supposed to have closed, and spend the money as if it were her own (see supra Part I.D.).  As noted in the PSR, OLDS's conduct against the Seville and other employers "is part of the same common scheme or plan to defraud employers, has a common purpose, and similar modus operandi" (PSR p.29).  OLDS's fraudulent activity against her more recent employers is incompatible with genuine remorse and acceptance of responsibility for her conduct in this case.  On this ground alone, the Court should deny her a two-level reduction for acceptance of responsibility.

Furthermore, defendant's guilty plea shortly before jury selection was set to begin does not constitute acceptance of responsibility as construed by U.S.S.G. § 3E1.1.  In the weeks leading up to this trial, the government spent hundreds of hours and many thousands of dollars to adequately prepare its case.  In addition, the Court had set aside time on its calendar, time that could have been spent trying another case or scheduling other Court business.  Defendant could have entered the same or a more favorable plea any time before November 13, 2007.  OLDS's decision to plead guilty only moments before jury selection – and only moments after the Court rejected her eleventh-hour, baseless request for new counsel – does not reflect any true

20

acceptance of responsibility or remorse for her actions but rather illustrates defendant's

realization that the government was poised to prove her guilty based on overwhelming evidence

against her.[9]

Under these circumstances, defendant is entitled to no credit for acceptance of

responsibility.  See United States v. Banks-Giombetti, 245 F.3d 949, 954 (7th Cir. 2001)

("Last-minute guilty pleas, however, rarely demonstrate acceptance of responsibility.";

upholding district court's denial of two-point reduction where defendant pleaded guilty

immediately before jury selection commenced); United States v. Hamzat, 217 F.3d 494, 498 (7th

Cir. 2000) ("[defendant] in fact did not make his intention to plead known right away:

approximately one year passed between his arrest and his plea. . . . We have previously held that

a defendant who waits to plead guilty until the 'brink of trial' is not entitled to a reduction . . .;

surely, therefore, waiting until after the original trial date is not 'at a sufficiently early point in

the process so that the government may avoid preparing for trial and the court may schedule its

calender efficiently.'") (quoting U.S.S.G. § 3E1.1, Application Note 6) (citation omitted).

And if the Court needs additional evidence to establish that OLDS has not fully accepted

responsibility for her conduct, the Court need only review defendant's two-page letter  attached

to the PSR, which illustrates defendant's continuing efforts to deceive.  Even while purporting to

express remorse, defendant attempts to shift the blame for her crimes to others and gives excuses

---

[9]Several essential witnesses were from out of the area and were compelled by subpoena to prepare to fly to Washington for this trial.  One of those witnesses was from California, another from Chicago, another from upstate New York, and another from Pittsburgh.  Although the government was able to reach these witnesses just before they were scheduled to board their flights, the unnecessary travel plans caused certain hardship and disruption in each witness's personal and professional lives.  For example, one witness, a medical doctor, was forced to cancel two days' worth of patients in anticipation of traveling to Washington for this trial.

for her conduct that are internally inconsistent as well as inconsistent with the facts of this case. For example, defendant cites her husband's job loss five years ago as an impetus for her crimes, but fails to explain why she stole from her employers and made false statements on her tax returns before 2003, when her husband was employed as a DC firefighter (PSR ¶ 71) and OLDS held various jobs in which she earned $30,000 to $55,000 per year (PSR ¶ 90; Appendices A-1, A-2, and A-3 attached to Abbott Aff.). Defendant also fails to explain why her bills "were insurmountable" before 2003, if, in fact, she "did not use the money to live a lavish lifestyle." The vast majority of DC-area families with one child and two working parents – even families with far lower incomes than that earned by OLDS – are able to "[k]eep a roof over [their] heads & food on the table" without resorting to crime. Defendant's poor excuses and attempted blame-shifting belie her statements of regret and reflect her failure to accept responsibility for her wrongdoing. When her letter is considered in combination with her ongoing criminal conduct and her last-minute guilty plea, the evidence is overwhelming that any reduction for acceptance of responsibility would be inappropriate in this case.

IV. **Defendant should be sentenced to 51 months in prison.**

Defendant deserves a significant punishment under the Guidelines. The government respectfully submits that the factors set forth at 18 U.S.C. § 3553(a) should compel this Court to impose a sentence at the top of the applicable Guideline range.[10]

_____

[10]As this Court is aware, the district court needs to consider the goals of Section 3553 in determining the appropriate sentence, however, the court is not required to specifically refer to each factor listed in § 3553(a). See United States v. Ayers, 428 F.3d 312, 315 (D.C. Cir. 2005). Section 3553(c) provides that the court at the time of sentencing shall state in open court the reasons for its imposition of a particular sentence. Section 3553(a) specifically sets out the factors to be considered: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness

A.  Nature of the Offense

Defendant did not choose to commit just one crime on one day.  Her schemes involved

numerous frauds over several years, and she chose on an almost daily basis to continue her

corrupt schemes.  She stole five separate checks in 2003 from CFSA, an agency whose mission

is to protect District children at risk for abuse and neglect, and she deposited them into her

personal account.  To hide and to further her scheme, she generated four fraudulent letters on

CFSA letterhead from the fictitious "Karen Edwards," as well as a fraudulent letter from a sham

company bearing her maiden name.[11]  (11/13/2007 Plea Hearing Tr. 13-15.)  Only a few months

after being caught stealing from CFSA and placed on leave without pay, she began working for

the Seville Condominium, from which she later began to steal by using one of their bank

accounts as her personal checking account on an almost daily basis – including after her

indictment in this case.  And after being terminated from the Seville for embezzlement, she

worked at the Meadow Greens Court Apartments, from which she stole money as recently as

June 2007, and at which she committed other fraudulent actions which led to her termination.

Defendant has repeatedly violated the trust that her employers placed in her and found ways to

_____

of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the . . . offense . . . as set forth in the guidelines . . . (5) any pertinent policy statement issued by the Sentencing Commission . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

[11]Only a few years before, from 1999 to 2000, OLDS had cashed numerous office checks and stolen money in various other ways when she worked for Dr. Michael Paul.

convert her employers' funds to her own personal use.

Furthermore, she used the income tax system to steal from the federal and District treasuries every year from tax year 1998 to tax year 2003.

In short, OLDS has parlayed her positions of trust and access, as well as her basic knowledge of the income tax system, into opportunities to devise and commit numerous individual acts of fraud over the course of many years.

B.  History and Characteristics of the Defendant

Defendant has a significant criminal record which places her in Criminal History Category IV and firmly establishes her propensity for deceit and dishonesty.  As enumerated in the PSR, between 1987 and 1993, she was convicted in six separate cases for numerous crimes involving fraud and dishonesty,  including felony uttering forged instrument, felony forgery of instrument, attempted theft by deception, attempt to defraud through unauthorized use of access device, felony larceny, and felony burning unoccupied building.  (PSR ¶¶ 51-59.)  Many of those crimes involved theft from an employer, beginning as early as 1988, when she forged and falsely endorsed the signature of Dr. James R. Dingfelder on claims payment checks issued by Blue Cross and Blue Shield and cashed the checks for her personal use.[12]  (PSR ¶¶ 54-56.)  She had four additional arrests, including one for forgery and uttering of instrument and another for false pretenses, which did not result in convictions. (PSR ¶¶ 63-66.)

Furthermore, as mentioned in Part IV.A., supra, OLDS stole from two additional

---

[12]Defendant also has a long history, dating back to at least 1994, of obtaining employment through the use of false pretenses.  (See, e.g., PSR ¶ 59; see also Exhibits 3 and 4 attached hereto (false written job references submitted in 2001 by OLDS to Georgetown University Hospital as part of her job application).)

employers while she was on pretrial release and under indictment in the instant case. Within

several months after she was put on leave without pay by CFSA on suspicion of embezzlement,

defendant was hired by the Seville Condominium, in Hyattsville, Maryland, as the on-site

property manager. Not long after her arrival, a new property management company was brought

in, and defendant used the transition from the old to the new property management company as

an opportunity to begin stealing from the Seville. (See PSR ¶¶ 31-34; Ford Aff. ¶¶ 5-6.) Less

than two months after being terminated from her job at the Seville, defendant began working for

E&G Property Services as an apartment manager at Meadow Greens Court Apartments in the

District. By June 2007, defendant was stealing at Meadow Greens, where she converted $580 in

money orders belonging to her employer to her personal use and engaged in other fraudulent

activities.[13] (See Ford Aff. ¶¶ 10-12; PSR ¶¶ 88 and 88a.) Defendant is a dangerous offender in

the sense that she has over the course of nearly twenty years used her intellect, education, and

personality to gain the trust of at least five different employers (Dr. Dingfelder, Dr. Paul, CFSA,

the Seville, and E&G) and then steal from them.

    Some defendants come before the Court for sentencing with limited educational or

economic opportunities and, while their individual circumstances are tragic, nevertheless end up

serving lengthy terms of incarceration. Defendant, however, is not similarly situated. Through

her legitimate salary as a District of Columbia employee, defendant was earning over $55,212

---

    [13]The government has intentionally made no effort to contact OLDS's current employer, in light of the sensitivity of that relationship and the defendant's express request to the Probation Officer that her current employer not be contacted (see PSR ¶ 86). However, the government fully shares the Probation Officer's concern, expressed in the PSR at ¶ 87, that defendant's current employer is at risk. Thus, the government requests that the Court make it a condition of self-surrender that defendant immediately inform her current employer of her conviction in this case.

per year by the time her thefts were discovered at the end of 2003. (See PSR ¶ 90.) She has throughout her entire life had access to educational and economic opportunities that some can only imagine. (See PSR ¶¶ 82-94.) But instead of using these gifts for good purposes, OLDS has used them to steal, cheat, lie, and exploit in order to advance her own self-interest. In this sense, defendant is a dangerous individual who, if not incapacitated for a substantial amount of time, is a sound bet to continue devising schemes to steal from her employers and the public. The Court should exercise its authority to protect other innocent victims from defendant. The surest, most effective way to deal with defendant's predilection for fraud is to impose a lengthy period of incarceration.

Defendant's two-page letter, which is replete with blame-shifting, poor excuses, and attempted minimization of her twenty-year-long record of fraud, provides further insight into her criminal disposition and completes a mosaic of an individual who – to the very end – will attempt to deceive and obfuscate in order to advance her own self-interest. Defendant's lack of remorse and her lack of respect for the criminal justice system are palpable, and her sentence should reflect that. The bottom of the Guideline range should be reserved for those who demonstrate true remorse for the harm they have caused. In contrast, defendant's criminal actions should be countered with strong justice.

     C.  <u>The Need for the Sentence to Reflect the Seriousness of the Offense</u>

       A sentence at the top of the applicable Guideline range would reflect the seriousness of defendant's crimes and would provide just punishment for her actions.

D.  The Need for the Sentence to Afford Adequate Deterrence

Only a lengthy period of incarceration would adequately promote respect for the law.  A sentence at the top of the Guideline range would send a powerful, salutary message of deterrence to public employees who might be tempted to follow defendant's corrupt path:  if you use your government position for private, illicit gain, you will face sure, swift, and severe punishment.  Similarly, sentencing at the top of the applicable Guideline range will serve as a warning to private employees who are placed in positions of trust that a violation of that trust will produce punitive consequences.  Finally, a sentence at the top of the Guideline range would serve as a deterrent to future tax cheats.  Anything less would promote an inappropriate incentive for members of each of these groups to cede to temptation and would be demoralizing for the overwhelming majority of honest employees who work hard, respect the law, pay their taxes, and choose not to betray the trust placed in them.

E.  The Need for the Sentence to Provide Educational or Other Benefits

Unlike many of the defendants who appear before this Court, OLDS has no need for the sentence to provide her educational or vocational training.  Defendant has had the benefit of post-secondary education and a career.

IV. **Restitution**

As set forth in the written plea agreement, OLDS agreed to pay restitution equal to the sum of: $49,399 (the loss caused by her conduct with respect to her 2001, 2002, and 2003 federal income tax returns), plus $13,902 (the loss caused by her conduct with respect to her 2001 and 2002 District of Columbia tax returns), plus $24,749.33 (the loss caused by her thefts from CFSA).  (Plea Agreement, p.4.)  Accordingly, the Court should order restitution in these

amounts.

## **CONCLUSION**

WHEREFORE, the government respectfully requests that this Court impose a 51-month

period of incarceration and order defendant to pay restitution to the United States and District of

Columbia treasuries.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


By:    _____/s/_____
ELLEN CHUBIN EPSTEIN, DC BAR #442861
ASSISTANT U.S. ATTORNEY
Fraud & Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-9832
Ellen.Chubin@usdoj.gov


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum in Aid
of Sentencing has been served by ECF notification upon counsel for defendant Mary Petras,
Esq., Assistant Federal Defender, fax 202-208-7515, and on Crystal Lustig, fax 202-273-0242,
U.S. Probation, on this ___ day of March, 2008.


_____/s/_____
ELLEN CHUBIN EPSTEIN
ASSISTANT U.S. ATTORNEY